**In re VERIFONE SECURITIES LITIGATION.**

**This Document Relates To All Actions.**

**No. C–90–2705–VRW.**

United States District Court,
N.D. California.

Feb. 21, 1992.

David B. Gold, A Professional Law Corp., Paul F. Bennett, Reed R. Kathrein, San Francisco, Cal., Ernest T. Kaufmann, Kaufman Malchman Kaufmann & Kirby, Los Angeles, Cal., Jeffrey H. Squire, Nadeem Faruqi, Kaufman Malchman Kaufmann & Kirby, New York City, William S. Lerach, Eugene Mikolajczyk, Milberg

Weiss Bershad Specthrie & Lerach, San Diego, Cal., Arthur N. Abbey, Mark Gardy, Abbey & Ellis, Robert Schachter, Zwerling, Schachter & Zwerling, Richard B. Dannenberg, Lowey, Dannenberg, Bemporad, Brachtl & Selinger, P.C., New York City, Stuart Savett, Kohn, Savett, Klien & Graf, P.C., Philadelphia, Pa., Richard Appleby, Law Offices of Richard Appleby, Edward Labaton, Goodkind, Labaton & Rudoff, Michael P. Fuchs, Wolf Popper Ross Wolf & Jones, New York City, for plaintiffs.

John Hauser, Philip Rotner, McCutchen Doyle Brown & Enersen, Melvin Goldman, Jack Londen, Morrison & Foerster, San Francisco, Cal., for defendants.

## AMENDED ORDER GRANTING MOTIONS TO DISMISS.*

WALKER, District Judge.

This litigation arises out of the initial public offering of common stock of VeriFone, Inc. on March 13, 1990.

The offering was underwritten on a firm commitment basis at $16 per share by Morgan Stanley & Co., Robertson, Stephens & Co. ("Robertson"), and Dean Witter Reynolds, Inc. ("Dean Witter"). As frequently happens,[1] the price of VeriFone stock jumped up on the first day of trading to substantially more than the initial offering price, closing at $19¼.[2] The stock price continued to climb during the spring and early summer of 1990, reaching a high of $25¼ on July 11, and then slid down during August and September, until the four-teenth of that month, a Friday, when it closed at $14⅞.

The following Monday, September 17, 1990, VeriFone issued a press release stating that its revenue growth in the second half of 1990 had fallen short of "internal expectations" and "current estimates by Wall Street analysts who have been following the Company." Declaration of Jordan Eth in Support of Defendant Verifone's Motion to Dismiss, filed April 12, 1991 ("Eth Decl."), Exh. I. The press release quoted VeriFone's CEO as stating that business in the company's "core financial market and in our rapidly expanding International markets continues to exceed our expectations, but not sufficiently to offset the shortfalls in other areas." *Id.* The press release announced that VeriFone had implemented cost containment measures and expansion controls in anticipation of slower revenue growth. *Id.*

On that day, the stock price declined 13.4% to close at $12⅞. The stock price then dropped to $7⅝ on the following day, a further decline of 40.8%. Since September 1990, the stock has made a steady recovery. During the week of June 3, 1991, the stock reached $19¾, and closed at $18½ on June 6, 1991.

On September 20, 1990, three days after VeriFone's press release, this litigation was initiated by the filing of a class action brought by eight of the leading law firms which specialize in securities practice,[3] on behalf of plaintiffs Minichino, Steen, Marchesi, and the Steinbergs. The next day,

---

* This order supersedes the court's Order Granting Motions to Dismiss, filed December 21, 1991. The amended order differs from the original only (1) in discussing the amended order of the Ninth Circuit in *In re Convergent Technologies Securities Litigation,* 948 F.2d 507 (9th Cir.1991) of December 6, 1991, (2) by clarifying the discussion pertaining to market efficiency and the fraud-on-the-market theory, and (3) in resolving the matters raised by plaintiffs' motion to vacate this order. The parties have, of course, been provided with the original order and have had an opportunity to present their positions concerning its terms.

**1.** See Richard A. Brealey and Stewart C. Myers, *Principles of Corporate Finance* at 345–346 (4th Ed.1991).

**2.** The court takes judicial notice of the daily closing prices of Verifone common stock, as reported by Dow Jones News and provided by defendants to the court in Exh. A of the supplemental declaration of Jordan Eth, filed June 7, 1991. Fed.R.Evid. 201.

**3.** Milberg Weiss Bershad Specthrie & Lerach; Abbey & Ellis; Kohn, Savett, Klein & Graf, P.C.; Goodkind, LaBaton & Rudoff; Lowey, Dannenberg, Bemporad, Brachtl & Selinger; Wolf Popper Ross Wolf & Jones; Zwerling, Schachter &

two other leading firms,[4] filed a class action on behalf of plaintiff Halkin. On November 8, 1990, the cases were reassigned to the undersigned. An amended consolidated complaint was filed on March 22, 1991 by all of these law firms on behalf of all plaintiffs in the *Minichino* and *Halkin* actions.

The amended complaint alleges seven causes of action under sections 11 and 12(2) of the Securities Act, section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder, section 20A of the Exchange Act as amended, California Corporations Code section 1507, and state law torts of fraud and negligent misrepresentation. VeriFone and some or all of ten individual officers and directors of VeriFone (collectively, "the VeriFone defendants") are named in all of the seven causes of action. Plaintiffs also name Morgan Stanley, Robertson and Dean Witter (collectively, "the underwriter defendants"), as representatives of a class of underwriters participating in the VeriFone public offering. The underwriter defendants are also named in all of the causes of action, but the underwriter class is named only in the causes of action arising under sections 11 and 12(2) of the Securities Act and section 1507 of the California Corporations Code.

The complaint alleges that defendants are responsible for misleading statements in and omissions from (1) VeriFone's March 13, 1990 registration statement and prospectus; (2) VeriFone's Forms 10–Q for the first and second quarters of 1990, filed with the SEC in May and August 1990; (3) press releases issued by VeriFone in April and July 1990 announcing the company's first and second quarter 1990 earnings; and (4) stock analysts' reports issued by some of the underwriter defendants in April, May and July 1990. Defendants have provided the court with all of the documents in which the allegedly false and misleading statements are contained. Eth Decl., Exh. A–I.

Finally, the complaint alleges that over 717,900 of the 3.9 million shares of VeriFone common stock in the IPO were sold by officers and directors of VeriFone while in possession of material nonpublic information, and that defendant Caufield on August 20, 1990 sold nearly 500,000 shares while in possession of material nonpublic information.

Defendants have moved to dismiss all counts of the complaint.

## I. PLAINTIFFS' FACTUAL ALLEGATIONS.[5]

VeriFone designs and manufactures products used by retail merchants and others to automate a variety of transactions, such as authorizing credit card purchases. First Amended Consolidated Class Action Complaint ("Compl."), ¶ 5. Since its founding, VeriFone has been financially successful, earning profits in each year from 1985 to 1989. Compl., ¶ 18. For example, in the two years prior to the IPO VeriFone's revenue had grown by 65.2% (in 1988) and 68.2% (in 1989). Compl., ¶ 36.

VeriFone's March 13, 1990 registration statement and prospectus described the company's past growth trends in revenues and earnings, included a list of its well-known customers, described markets for potential future growth, and listed other well-known companies that were evaluating VeriFone's products. The prospectus also contained a detailed discussion of "risk factors" associated with purchase of the stock. Eth Decl., Exh. A at 6–8.

Plaintiffs contend that the risk factor discussion was uninformative boilerplate which did not disclose with sufficient detail the risks faced by holders of VeriFone stock. In particular, plaintiffs claim that

Zwerling and the Law Offices of Richard Appleby.

4. The Law Offices of David B. Gold and Kaufman Malchman Kaufmann & Kirby.

5. For the purposes of this motion to dismiss, the court must assume that the facts pled in the complaint are true. *Western Reserve Oil & Gas Co. v. New,* 765 F.2d 1428, 1430 (9th Cir.1985). The court, however, need not accept legal conclusions asserted in the complaint, even if pled as "facts". *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 2944, 92 L.Ed.2d 209 (1986).

the company's historic revenue growth trends had ceased and that the company was "facing a brick wall" both in the company's existing markets and in the company's attempt to finish new products and open new markets. Opposition to Veri-Fone's Motion to Dismiss ("Opp.") at 2.

Plaintiffs do not allege that any statement in the prospectus is literally untrue. Instead, plaintiffs' claim is that the omission of facts known to defendants, and only to defendants, at the time of the IPO, made the true statements in the prospectus materially misleading.

In paragraphs 21 and 41 of the complaint, plaintiffs present a most unfavorable description of VeriFone's business prospects at the time of the March 13, 1990 public offering. According to the complaint, some of VeriFone's target markets were growing slower than in the previous years; historic sales channels and core markets were showing little future potential; future growth was dependent on new markets in which VeriFone had little marketing expertise, no customers and no reasonable expectation of success; near-term future sales and growth figures would be inflated by atypically large one-time sales; and the introduction of new products was suffering from delays in development and weak customer interest. Compl., ¶¶ 21, 41. In short, plaintiffs allege that VeriFone's future was to be as dim as its past had been bright.

Plaintiffs further claim that defendants' effort to mislead the market in the manner described above continued for the six months after the March 13 IPO. In addition to the matters omitted from the prospectus, plaintiffs find the same allegedly misleading omissions, and others, in Veri-Fone's press releases, in VeriFone's quarterly reports filed with the SEC, and in analysts' reports prepared by Morgan Stanley and Dean Witter.

On April 16, 1990, VeriFone issued a press release announcing its results for the quarter ending March 30, 1990. The document reported revenue and income growth, of 49% and 20% respectively, over the same period in the prior year. The press release further announced that the company was "pleased" with the continued growth and discussed the new products introduced during the quarter. Compl., ¶ 45; Eth Decl., Exh. C. However, the press release again failed to disclose the adverse information which plaintiffs assert should have been present in the March 13 prospectus. Furthermore, the press release did not explain that, according to plaintiffs, VeriFone's first quarter results were atypically "boosted" by large one-time orders. Nor did the press release provide detail showing that certain of Veri-Fone's markets were experiencing "flat" sales growth. Compl., ¶ 46. Not surprisingly, plaintiffs find similar fault with Veri-Fone's Form 10–Q for the quarter ending March 30, 1990, filed on May 14, 1990. Compl., ¶ 51; Eth Decl., Exh. E.

VeriFone's July 17, 1990 press release, announcing results for the quarter ending June 29, 1990, also described a successful quarter. Again, revenue and net income grew in comparison to the same period in the previous year (this time, by 37% and 33%, respectively). Combining first and second quarter results, the July 17 press release calculated first-half revenue growth of 42% and income growth of 29%. Defendant Tyabji is quoted in the press release as being "pleased with the continued growth," and he discussed VeriFone's second quarter success in reaching new markets. Eth Decl., Exh. F. The content of the July 17 press release is repeated in VeriFone's Form 10–Q for the second quarter, filed August 7, 1990. Eth Decl., Exh. H.

Again, plaintiffs find fault. Compl., ¶¶ 53, 58. Neither the press release nor the Form 10–Q reported any of the information plaintiffs claim is also missing from earlier VeriFone disclosures. In addition, by this time, say plaintiffs, orders for Veri-Fone products had slowed, so that future revenue and income figures would be far lower than the past trend would indicate. But VeriFone did not report this decrease in new business, nor did the company project declining future earnings.

The underwriter defendants also touted VeriFone's success in the period following the IPO. In April, Morgan Stanley issued a report giving a "purchase recommendation" for VeriFone common stock and predicting that VeriFone would continue to grow. Compl., ¶ 42; Eth Decl., Exh. B. Plaintiffs allege that Morgan Stanley had "no reasonable basis" for such a prediction, particularly in light of the "adverse facts and trends" described above. Compl., ¶ 44.

Dean Witter issued two reports on Veri-Fone. In May, Dean Witter made earnings growth estimates "identical to those made by Morgan Stanley," and projected earnings growth for certain of VeriFone's target markets and for the transaction automation industry as a whole. Compl., ¶ 47. This report opined that current holders of VeriFone common stock should continue to hold the stock, but cautioned potential new investors that the post-IPO "price surge" made the stock an unattractive new investment. Eth Decl., Exh. D. Dean Witter issued a further report in July, "reaffirming its earlier earnings estimates and projected growth rates, but touting *even greater upside potential*." Compl., ¶ 54 (emphasis in original). The July report contained the same "hold" recommendation as the May report. Eth Decl., Exh. G. Plaintiffs complain that nowhere in either the May or July reports did Dean Witter discuss the information also omitted by VeriFone in its disclosures, nor did Dean Witter disclose certain technical problems experienced by VeriFone in new product development. Compl., ¶¶ 49, 56. Plaintiffs further assert that Dean Witter had "no reasonable basis" for its projections. *Id.*

Plaintiffs allege that the Morgan Stanley and Dean Witter reports were based on information provided by VeriFone.

Compl., ¶¶ 43, 48, 55. The complaint also alleges that defendants were in contact with stock market professionals, analysts, money managers, and similar members of the investment community. Compl., ¶ 60. Finally, plaintiffs allege that from March 13 to September 19, analysts, including employees of the underwriter defendants, made projections of VeriFone's financial prospects based on information from the defendants and confirmed those projections with VeriFone before publication. Compl., ¶ 61.

Plaintiffs allege that the "truth" about VeriFone only became known after Veri-Fone released the September 17 press release. That disclosure, and the market's quick and negative reaction, form the basis for most of plaintiffs' causes of action.

## II. PLAINTIFFS' LEGAL CONTENTIONS.

### A. *The Fraud–On–The–Market Theory.*

Defendants' liability is predicated on the "fraud-on-the-market" theory seemingly approved in principle by four justices of the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). This theory posits that information regarding a corporation's expected future value is quickly and accurately incorporated into the price at which the corporation's securities trade in public markets.[6] Defendants are therefore held liable for any material misrepresentation which is proved to have caused the price of a security traded on an open and developed securities market to deviate from the security's efficient price which, under the theory, is presumed to reflect the price at which the security would have traded in the absence of the misleading information.[7] *Id.* at 246,

---

**6.** Jonathan R. Macey and Geoffrey P. Miller, *Good Finance, Bad Economics: An Analysis of the Fraud-on-the-Market Theory*, 42 Stan.L.Rev. 1059, 1076–83 (1990); Ronald J. Gilson and Reinier H. Kraakman, *The Mechanisms of Market Efficiency*, 70 Va.L.Rev. 549, 561 (1984).

**7.** The Supreme Court's use of the term "fair market price," *Basic, Inc.*, 485 U.S. at 248, 108 S.Ct. at 992, may unfortunately and inaccurately suggest that application of the fraud-on-the-mar-

ket theory requires proof that the market *correctly* reflects some "fundamental value" of the security. To apply the fraud-on-the-market theory, it is sufficient that the market for a security be "efficient" only in the sense that market prices reflect the available information about the security. Robert G. Newkirk, *Sufficient Efficiency: Fraud on the Market in the Initial Public Offering Context*, 58 U.Chi.L.Rev. 1393, 1403 (1991). To avail themselves of the fraud-on-the-market presumption, plaintiffs should only be

108 S.Ct. at 991. Persons who purchase or sell the security during the period of the price deviation, and who are injured as a result, are entitled to recover from the responsible defendants without regard to whether the persons trading knew of the misrepresentation or misleading omission which caused the price deviation. In this way, the fraud-on-the-market theory dispenses with the traditional requirement of individual reliance in securities fraud cases.

The fraud-on-the-market theory recognizes that average investors in a developed securities market do not personally need access to the elaborate disclosure of documents and accounting data required by our securities laws.[8] Market professionals obtain information from myriad sources, including the issuer, market analysts, and the financial and trade press. The professional traders analyze information about securities, and the trading activity of these knowledgeable investors pushes the price of the security toward a value which reflects all publicly available information. In this way, securities prices on the national exchanges reflect (albeit not perfectly) the expected future cash flows from the security. An investor making trades who has not relied on particular disclosures is presumed under the fraud-on-the-market theory to rely on the integrity of information reflected in the market price of the security. *Basic Inc.*, 485 U.S. at 247, 108 S.Ct. at 991. In this way, an investor who has never seen or heard of a fraudulent disclosure is no less a victim than one who pored over its details.[9]

The fraud-on-the-market theory thus shifts the inquiry from whether an individual investor was fooled to whether the market as a whole was fooled.[10] Hence, the theory not so much eliminates the reliance requirement as subsumes it in the fraud-on-the-market analysis. In the same way, the theory also subsumes the

inquiry into materiality, causation and damages. For if a misleading or fraudulent disclosure or omission could have had no effect on the security's market price, the information cannot have been material. Similarly, if a misstatement or omission had no effect on the market price (because, for example, the market already had the correct information from other sources) then there could be no causation and no damages. The case at bar calls upon the court to explore materiality in this context.

The class alleged in the complaint are persons who purchased VeriFone common stock in the initial public offering on March 13, 1990 through September 18, 1990, the day following the press release. For there to be recoverable damages under the fraud-on-the-market theory, plaintiffs must allege that the prices paid by them were inflated by the difference between the efficient price of the common stock and the higher amount the class members actually paid for the stock. Of course, if defendants' alleged fraud did not inflate the price of the stock purchased by plaintiffs over that which would have prevailed had defendants fully complied with their obligations under the securities laws, then plaintiffs were not damaged and cannot recover.

The starting point for analyzing a pleading under the fraud-on-the-market theory, therefore, is to identify the false statement or misleading omission which could have caused the stock price to deviate from its efficient price. In this case, the starting point lies in the September 17 press release. According to plaintiffs, that release disclosed to the market the true facts which, in turn, had the effect of reducing the price of VeriFone common stock from its artificially high price to its efficient price.

It may be asked what was contained in the September 17 press release that disclosed the falsity or misleading nature of

---

required to prove that, absent the alleged fraud, the market price would be unbiased, not that it would be infallible. *Id.* at 1422.

**8.** Gilson & Kraakman, 70 Va.L.Rev. at 569–70.

**9.** Daniel R. Fischel, *Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities,* 38 Bus.Law. 1, 4 (1982).

**10.** Daniel R. Fischel, *Efficient Capital Markets, the Crash, and the Fraud on the Market Theory,* 74 Cornell L.Rev. 907, 909 (1989).

the statements made prior to that release? For, to put the matter concretely, if defendants' statements or omissions before the September 17 press release were not false or misleading *to the market*, then plaintiffs cannot have suffered damages attributable to these statements or omissions.

It is at this point in the analysis—the very beginning—that plaintiffs' theory of the case begins to break down.

### B. *The Duty to Disclose Forward–Looking Information.*

Plaintiffs do not allege that any of the factual statements made by the defendants are false. Instead, plaintiffs claim that the defendants omitted to disclose the information, discussed above, which would be necessary for investors to properly value Veri-Fone common stock. In the absence of the omitted information, say plaintiffs, the information provided by defendants to the market was misleading and caused, as the fraud-on-the-market theory suggests, a deviation between the market price of Veri-Fone stock and its efficient price. Plaintiffs argue that because financial analysts measure the value of a share of stock by "the reasonable estimated future earnings" of the issuer, VeriFone and other issuers of securities perpetrate a fraud on the market when they disclose only a portion of the information which investors would find necessary to estimate future earnings. Opp. at 11.

Contrary to plaintiffs' argument, the securities laws do not require an issuer of stock to disclose every bit of information that has some bearing on the issuer's future earnings.[11] As a matter of law, silence is not misleading in the absence of a duty to disclose. *Basic Inc.*, 485 U.S. at 239 n. 17, 108 S.Ct. at 987 n. 17. Thus, for plaintiffs to prevail on a claim that the literally truthful information provided by defendants was insufficient to prevent a fraud on the market, plaintiffs must show not only that a particular piece of information would have been helpful to investors, but also, as a threshold matter, that the information was of a kind which the defendants had a legally cognizable duty to disclose. *Id.; Alfus v. Pyramid Technology Corp.*, 764 F.Supp. 598, 601 (N.D.Cal.1991) ("*Alfus II*").

Plaintiffs point to three sources of a duty placed upon defendants to disclose the omitted information described in the complaint. First, plaintiffs argue that under Sections 11, 12(2), 10(b), and Rule 10b–5, defendants have a duty to reveal all information necessary to insure that statements actually made are not misleading. 15 U.S.C. § 77k, 77l(2), 78j. 17 C.F.R. § 240.-10b–5. Second, plaintiffs point to Regulation S–K, which the SEC promulgated to govern the drafting of registration statements, annual reports and certain other filings required by the Securities and Exchange Acts. 17 C.F.R. § 229.10(a). Item 303 of Regulation S–K requires that issuers of securities disclose trends, demands, commitments, events or uncertainties known to the issuer that are likely to affect the corporation's liquidity, net sales or revenues. 17 C.F.R. § 229.303(a)(1)–(3). Finally, plaintiffs point to the reporting and disclosure requirements which govern members of the New York Stock Exchange, the American Stock Exchange and the National Association of Securities Dealers.

---

**11.** A large and somewhat convoluted body of law has been created over the past fifty years regarding the duty to disclose in securities fraud cases. But the basic principles are really no different from those stated by Chief Justice Marshall in the case of *Laidlaw v. Organ*. In resolving a dispute between New Orleans tobacco merchants in the closing days of the War of 1812, where only one of the merchants knew that the war had ended, Chief Justice Marshall stated the principle:

The question in this case is, whether the intelligence of extrinsic circumstances, which might influence the price of the commodity, and which was exclusively within the knowledge of the vendee, ought to have been communicated by him to the vendor? The court is of the opinion that he was not bound to communicate it. It would be difficult to circumscribe the contrary doctrine within proper limits, where the means of intelligence are equally accessible to both parties. But at the same time, each party must take care not to say or do any thing tending to impose upon the other.

15 U.S. (2 Wheat.) 178, 195, 4 L.Ed. 214 (1817).

### 1. Materially misleading omissions.

Plaintiffs assert that the failure of the defendants to disclose the adverse information identified in the complaint is actionable on the grounds that this information was necessary to prevent the literally truthful information from misleading the market. Plaintiffs describe defendants' disclosures as "half truths," Opp. at 10, which, under the guise of accurate historical reporting, served only to mislead investors about VeriFone's likely future. Compl., ¶ 22.

At the time of the hearing, defendants relied upon *Alfus v. Pyramid Tech. Corp.*, 745 F.Supp. 1511 (N.D.Cal.1990) (*"Alfus I"*), in which the court determined that accurate historical reporting and general statements of optimism do not imply a misleading projection of future results. *Id.* at 1516. Subsequent to argument, the Ninth Circuit handed down *In re Convergent Technologies Securities Litigation*, 948 F.2d 507, 513 (9th Cir.1991), which, in essence, adopted *Alfus I* as the law of this Circuit.[12] *See also In re Apple Computer Securities Litigation*, 886 F.2d 1109, 1118–19 (9th Cir.1989) (generally optimistic statements regarding the future are not actionable absent evidence that the corporation did not believe the statements at the time they were made). The *Convergent Technologies* court further held that an issuer's internal projections need not be disclosed, even if those internal projections contain more detailed information than the data publicly disclosed. 948 F.2d at 516.

Although the Ninth Circuit did not spell out any reasoning for its holding in *Convergent Technologies*, the result reached is sound. Shareholders and potential investors are most in need of "hard" information, such as sales and profit data, because such information is in the exclusive control of the corporation.[13] Indeed, the corporation is not merely the "least cost provider" of this information, it is probably the only source of it. This information, when accurately reported, is rarely subject to misinterpretation, even if the disclosure is accompanied by generally optimistic statements about the future by corporate officers.[14] Professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives, who have a personal stake in the future success of the company. *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 515 (7th Cir.1989).

Conversely, the corporation's own officers are not likely to be the most reliable source of projections of future corporate performance. Officers and internal analysts may be biased by their personal goals in evaluating the corporation's prospects for short- and long-term success. As long as the corporation provides accurate hard data to the market, professional analysts and investors are in at least as good and probably a better position to make the predictions about a corporation's future which are relevant to the valuation of corporate securities.[15]

This is true for a number of reasons. First, the professional analyst has more interest in making the most accurate prediction possible, because the analyst's reputation and livelihood depend solely on the analyst's ability to be correct. The corporate officer's success does not depend primarily or even significantly on an ability to predict stock prices. Second, the analyst has the benefit of objectivity because the analyst is removed from the daily operations of the corporation, whereas the corporate officer is in the thick of these developments. Finally, and most importantly, the

---

**12.** On December 6, 1991, the Ninth Circuit amended its earlier opinion in *Convergent Technologies* which, in turn, prompted this amended order.

**13.** Gilson & Kraakman, 70 Va.L.Rev. at 561; Fischel, 74 Cornell L.Rev. at 921.

**14.** Frank H. Easterbrook and Daniel R. Fischel, *Mandatory Disclosure and the Protection of Investors*, 70 Va.L.Rev. 669, 674 (1984).

**15.** Roger J. Dennis, *Mandatory Disclosure Theory and Management Projections: A Law and Economics Perspective*, 46 Md.L.Rev. 1197, 1209–15 (1987); Jeffrey N. Gordon and Lewis A. Kornhauser, *Efficient Markets, Costly Information, and Securities Research*, 60 N.Y.U.L.Rev. 761, 794 (1985).

analyst is skilled in combining the specific data disclosed by the corporation with general knowledge about the industry and the national and international economies in which the corporation competes. Corporations call on their officers for other skills.

Thus, it is in the best economic interests of shareholders and other investors for the corporation to provide accurate historical data to the market, and leave the task of predicting the future to others.[16]

This is not to suggest that a corporation should never make predictions, and the securities laws do not prohibit a corporation from doing so. Securities Act Release No. 5992, 43 Fed.Reg. 53246 (1978) (Disclosure of projections and other items of forward-looking information in Commission filings is permitted but not required.) In fact, under the "safe harbor" provisions of Rule 175, 17 C.F.R. § 230.175, a corporation may disclose a forecast, if made in good faith and with a reasonable basis, without exposing itself to liability should that forecast turn out to be wrong.

The SEC regulations allowing, but not requiring, the disclosure of good faith forecasts were the result of a carefully considered change in SEC policy, and is founded on the understanding that reliable information, regardless of its source, may help investors make more informed decisions and that investors are capable of properly valuing the predictions made by the corporation itself.[17]

■■■ The rule in *Convergent Technologies* fits well into the disclosure scheme created by the securities laws. A public corporation is under an absolute duty to provide certain material "hard" data about the corporation's past performance. This information is known only to the corporation, and thus the corporation is strictly liable for the failure to disclose accurate and non-misleading data. Disclosure of this hard data enables investors to combine such firm-specific information with general knowledge obtained from other sources in

order to develop some estimate of the corporation's future performance. This estimate is then used to value the securities issued by the corporation. The corporation may also provide the market with good faith predictions of its own future success, information which is not in the exclusive control of the corporation. Disclosure of this soft information by the corporation is optional, and liability will not attach for good faith, but erroneous, disclosure. Investors, knowing the inaccuracy inherent in forecasting, may choose to use or disregard predictions by the corporation at their option, after considering the value of such a prediction.

A rule which required the corporation to disclose its own internal forecasts or otherwise provide the market with the corporation's prediction of its own future would, somewhat paradoxically, be less beneficial to investors than the current SEC policy. Because of the inherent imprecision of such "soft" information, the disclosing corporation most likely would surround the prediction with "boilerplate" warnings drafted to discourage reliance by investors on the prediction. Corporations might also eschew otherwise valuable forecasting activity in an attempt to minimize liability for actionable disclosures.[18]

Often, "disclosure" of predictions is duplicative of information already known to most analysts. As Judge Easterbrook has observed, a firm need not "disclose" Murphy's Law or the Peter Principle, even though these have substantial effects on business. *Wielgos*, 892 F.2d at 515. Similarly, a firm need not disclose that 50% of all new products vanish from the market within a short period of time, because this forward-looking "fact" is known to all serious analysts. *Id.* Duplicative disclosure is a hinderance, not a benefit, to investors, and the securities laws do not require a corporation "to bury the shareholders in an avalanche of trivial information—a result that is hardly conducive to informed deci-

---

**16.** Easterbrook & Fischel, 70 Va.L.Rev. at 703.

**17.** 43 Fed.Reg. at 53246–47. *See also* Dennis, 46 Md.L.Rev. at 1197–1200.

**18.** Easterbrook & Fischel, 70 Va.L.Rev. at 709.

sionmaking." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 448–49, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); *Convergent Technologies,* 948 F.2d at 516.

Information is not a free good. There are social costs to the creation and dissemination of accurate information.[19] Still other social costs may be created by a lack of information. SEC policy attempts to balance these costs by imposing disclosure obligations on the least cost information providers.[20] For the reasons noted, the corporation itself is the most efficient source of historical corporate data, and there are few social costs created by its disclosure. Mandatory disclosure of "soft" information by the corporation, by contrast, may create its own costs. Although a corporation has sound business reasons for creating internal forecasts, there are equally sound business reasons for a corporation to keep these forecasts confidential. Disclosure could provide information to competitors and potential future customers which would be to the detriment of the disclosing corporation.[21] To impose a disclosure obligation for such information simply cannot be in the best interests of investors and shareholders.

### 2. Regulation S–K.

■ The above analysis also informs the court's understanding of the disclosure requirements in SEC Regulation S–K. Although Item 303 specifies that the corporation is to "[i]dentify any known trends or any known demands, commitments, events or uncertainties," Instruction 7 to Item 303 provides that corporations "are encouraged, but not required, to supply forward-looking information" and any forward-looking information so disclosed is protected by the Rule 175 "safe harbor." 17 C.F.R. § 229.303, Instruction 7. Regulation S–K thus governs the disclosure of known historic trends, but does not provide a basis of liability where a corporation fails to "disclose" the future. *Convergent Technologies,* 948 F.2d at 516.

### 3. Exchange rules.

■ Although plaintiffs refer to the rules of the various public securities exchanges, Compl., ¶ 68(b)–(d), in the Ninth Circuit the violation of an exchange rule will not support a private cause of action. *Jablon v. Dean Witter & Co.,* 614 F.2d 677 (9th Cir.1980); *Carrott v. Shearson Hayden Stone, Inc.,* 724 F.2d 821 (9th Cir. 1984).

### III. VERIFONE DEFENDANTS' MOTION TO DISMISS.

■ Upon motion by defendant, a complaint is to be dismissed if it fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). In considering a motion to dismiss, the court must presume that the plaintiffs' allegations are true, and is to grant the motion to dismiss if it appears that plaintiffs can prove no set of facts which would entitle plaintiffs to relief. *Sun Savings & Loan Assoc. v. Dierdorff,* 825 F.2d 187, 191 (9th Cir.1987); *Wool v. Tandem Computers Inc.,* 818 F.2d 1433, 1439 (9th Cir.1987); *Alfus I,* 745 F.Supp. at 1514. A complaint may be dismissed as a matter of law for two reasons: (1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable theory. 2A J. Moore, *Moore's Federal Practice* ¶ 12.08 at 2271 (2d ed. 1982).

### A. *Misstatements or Omissions Under Sections 11 and 12(2), and Rule 10b–5.*

The *Convergent Technologies* court determined that neither the disclosure of accurate historical data accompanied by general statements of optimism nor the failure to disclose internal forecasts of future performance is actionable. Thus, the task before the court in this motion is to determine whether plaintiffs' complaint alleges facts other than those found in *Alfus I* and *Convergent Technologies* not to state a cause of action.

---

19. Gordon & Kornhauser, 60 N.Y.U.L.Rev. at 787–88; Gilson & Kraakman, 70 Va.L.Rev. at 594–95.

20. Gilson & Kraakman, 70 Va.L.Rev. at 601; Easterbrook & Fischel, 70 Va.L.Rev. at 681–82.

21. Easterbrook & Fischel, 70 Va.L.Rev. at 674.

Defendants contend that the complaint does not state a claim for any material misstatements or omissions under any cause of action because it fails to allege that defendants made untrue statements of material fact or omitted any material fact necessary to make any statements which were made not misleading.

1. Statements made by the VeriFone defendants in the prospectus and post-prospectus filings and press releases.

Defendants argue that the prospectus' representations about past growth and success, current customers, and general plans for the future contained no misstatements, and more importantly for this motion, contained no future projections of VeriFone's future earnings or financial performance. Hence, defendants argue, plaintiff's allegations that the prospectus failed to warn that the company "faced a brick wall" do not allege a misleading omission because, even if true, the prospectus had not represented otherwise.

The characterization of the complaint as alleging that defendants concealed their knowledge that VeriFone was going to "hit a brick wall," while glib, is no substitute for a coherent theory of liability. Nothing in plaintiff's dexterously drafted 66–page complaint suggests that plaintiffs have developed such a theory to support their claims. Every allegation of misrepresentation or material omission ultimately relies on the failure to disclose a forecast of future sales or revenues.

In ¶¶ 21 and 41 of the complaint, plaintiffs detail the "adverse material facts and trends" which were allegedly known by defendants but not disclosed in the March 1990 prospectus. Subparagraphs 21(a), 21(b) and 21(c) claim that the prospectus failed to disclose estimated future growth rates in revenue and unit sales. These claims call for disclosure of internal forecasts, and therefore do not support liability.

Subparagraphs 21(d), 21(e), 21(f) and 21(g) discuss difficulties that VeriFone would be facing in marketing new products and competing in new markets. As discussed above, the securities laws presume that skilled investors are aware that a corporation's performance with a new product or in a new market is unlikely to replicate past successes. *Wielgos*, 892 F.2d at 515. Nevertheless, VeriFone's March 13 prospectus, on page 6, cautioned investors about the risks inherent in VeriFone's new business ventures. Eth Decl., Exh. A. Further disclosure is not necessary, as these claims call for projections of future performance.

Subparagraphs 21(h), 21(i) and 21(j), discussing future sales and revenue in certain of VeriFone's sub-markets, amount to nothing more than a failure of VeriFone to predict the future. Subparagraphs 41(a), 41(c) and 41(d) also allege that VeriFone failed to "disclose" the future in the March 1990 prospectus.

Only subparagraph 41(b) claims that VeriFone failed to disclose an actual fact, that VeriFone did not have current orders with the "customers" listed on page 27 of the prospectus. However, the prospectus neither expressly states or implies this fact. Inserted in the context of a discussion of VeriFone's historical marketing strategy, the list is obviously a compilation of past and current customers, and nothing more.

In fact, nowhere in either of these two paragraphs do plaintiffs establish a link between a misleading statement or implication in the prospectus and an actual fact, not a speculation about the future, omitted from the document. The prospectus makes no projections whatsoever and contains a detailed discussion of risk factors. Although the risk factors section might not have been adequate to alert an investor to potential risks if the prospectus had in fact made affirmative projections of the company's prospects, here, where no projections were made, the risk factors section was adequate and the prospectus as a whole is not misleading.

Accordingly, even if defendants had knowledge of certain facts which would support internal forecasts, disclosure of such facts is not required to make

the prospectus not misleading. *Convergent Technologies*, 948 F.2d at 516.

■■■ Plaintiffs' allegations regarding omissions from Verifone's post-prospectus disclosures similarly fail to state a claim that the VeriFone defendants omitted information they were under a duty to disclose. In ¶¶ 46 and 51 of the complaint, plaintiffs claim that VeriFone's April 16, 1990 press release and first quarter form 10–Q, filed with the SEC on May 14, 1990, failed to disclose, in addition to the projections detailed in ¶¶ 21 and 41, that VeriFone's first quarter sales were "boosted" by large one-time sales which would not recur in future quarters, a prediction, and that "sales growth" was "flat" in certain of VeriFone's markets. To the extent that this last claim is not a demand that VeriFone predict its future sales, the information regarding past sales trends is accurately and adequately disclosed in the press release. Analysts reading VeriFone's press release and prior disclosures, such as the prospectus, can easily calculate VeriFone's historic sales and growth trends, and determine for themselves if any slowdown in historical growth is cause for concern.

■■■ The same defects are contained in plaintiffs' allegations regarding VeriFone's July 17, 1990, press release and second quarter form 10–Q, filed on August 7, 1990. Plaintiffs again claim, in ¶¶ 53 and 58, that defendants did not disclose that sales in the quarter were atypically large and that the future would not be as bright as the past. Again, this type of allegation in effect calls upon VeriFone to predict future sales, and thus does not state a claim under the securities laws.

Curiously, given plaintiffs' repeated claims that VeriFone failed to disclose the future, plaintiffs also allege in ¶ 53 that VeriFone "had no reasonable basis" for the "earnings estimates" reported in the July 17, 1990 press release, even those estimates were repeated as actual earnings in the second quarter form 10–Q, a document plaintiffs do not allege to contain erroneous data. This type of allegation highlights the inconsistency inherent in plaintiffs' legal theory: plaintiffs seek to place defendants in the awkward position of being required to disclose all estimates of the future but liable for reporting estimates even if they turn out to be factually correct.

Because defendants had no duty to disclose any of the "omissions" detailed by plaintiffs in the complaint, the omission of this information cannot be materially misleading under the fraud-on-the-market theory. Thus, defendants' motion to dismiss all claims relating to purported misrepresentations or omissions in the prospectus and post prospectus disclosures by VeriFone is GRANTED.

■■■ When a complaint is dismissed for failure to state a claim upon which relief can be granted, district courts have discretion to deny plaintiffs leave to amend if amendment of the complaint would be futile. "If the court determines that the 'allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency,' then a dismissal without leave to amend is proper." *Albrecht v. Lund*, 845 F.2d 193, 195 (9th Cir.1988).

■■■ The initial burden of an amorphous and diffuse securities class action complaint is placed on the defendants. This burden ultimately comes to rest on shareholders who, directly or indirectly, pay for the compliance with and private enforcement of the securities laws. To the extent that private securities litigation discourages misconduct, shareholders receive something in return.[22] But a complaint unable even to identify the fraudulent conduct it supposedly targets serves no useful purpose. The costs imposed by such a plead-

---

22. A growing academic literature questions whether the prevailing judicial handling of such suits advances their stated purpose, the maintenance of fair and open securities markets. *See, e.g.,* Janet C. Alexander, *Do the Merits Matter? A Study of Settlements in Securities Class Actions,* 43 Stan.L.Rev. 497 (1986); Jonathan R.

Macey and Geoffrey Miller, *The Plaintiff's Attorney's Role in Class Action and Derivative Litigation,* 58 U.Chi.L.Rev. 1 (1991); Roberta Romano, *The Shareholder Suit: Litigation Without Foundation?,* 7 Law, Econ. & Organ. 55 (1991); Andrew Rosenfield, *An Empirical Test of Class Action Settlement,* 5 J.Legal Stud. 113 (1976).

ing, while not precisely measurable, become a deadweight loss for society.[23]

Here, the complaint itself reflects the best efforts of at least ten distinguished law firms that specialize in this area [24] and could not be improved. It incorporates allegations of the two actions filed on September 20 and 21, 1990. Because no fee shifting is available to internalize the social costs of this litigation, the court determines that it would be unwise and an unfair burden on shareholders to give these law firms more than two bites at an apple they have not been able to get their teeth into. Accordingly, the motion to dismiss the federal securities law claims based on the prospectus and the other reports and press releases issued by VeriFone is GRANTED WITH PREJUDICE.

### 2. VeriFone defendants' liability for statements in stock analysts' reports.

 Although accurate reporting of historical data does not create a misleading impression of future growth, where actual forecasts are made liability may be premised on false or misleading projections under Rule 10b–5. *Marx v. Computer Sciences Corp.*, 507 F.2d 485, 489 (9th Cir. 1974); *Alfus II*, 764 F.Supp. at 602. As for all 10b–5 actions, plaintiffs must plead and ultimately prove scienter. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In the context of an allegedly misleading projection, it is not sufficient to allege in hindsight that the projection turned out to be wrong. *Marx*, 507 F.2d at 490. Plaintiffs can only satisfy the scienter requirement by presenting facts which tend to show that, at the time the projection was made, there was no reasonable basis for the defendants' belief that the projection might come true. *Id.*

 Plaintiffs bear an additional burden when claiming that the corporate defendants are liable for the allegedly mis-

leading forecasts issued by others. In *Elkind v. Liggett & Myers*, 635 F.2d 156 (2d Cir.1980), the court held that analysts' reports cannot be attributable to the corporation even though it had initiated contacts with analysts and corrected their reports. *Elkind*, an opinion of the Second Circuit, has been followed in this district. *See Alfus II*, 764 F.Supp. at 603. In order to be liable for unreasonably disclosed third-party forecasts, defendants must have put their imprimatur, express or implied, on the projections. *Elkind*, 635 F.2d at 163. Where a corporation has "so involve[d] itself in the preparation of reports and projections by outsiders," the corporation incurs a duty to disclose information necessary to correct errors in the projections and prevent the projection from being materially misleading. *Id.*

 In ¶¶ 42, 47 and 54 of the complaint, plaintiffs allege that Morgan Stanley and Dean Witter, two of the underwriter defendants, issued analysts' reports which contained misleading projections of VeriFone's future performance. Plaintiffs further allege, in ¶¶ 43, 48 and 55 of the complaint, that VeriFone contributed to these analysts' reports. Plaintiffs claim that VeriFone supplied nonpublic "background information" to the analysts, reviewed and confirmed the content of the finished report, was given the chance to correct the report, and obtained copies of the analysts' reports for redistribution. At the same time, according to plaintiffs, the VeriFone defendants were aware of internal forecasts and projections, see discussion in section III.A.1., *supra,* which projected a far less positive future for the company. Compl., ¶¶ 21, 41, 44, 46, 49, 51, 53, 56, 58.

In *Alfus II*, the court found that similar allegations stated a claim under Rule 10b–5. 764 F.Supp. at 604–05. The complaint in *Alfus II*, however, stated facts with suf-

---

**23.** In cases where a fee shifting statute is available to compensate defendants if they prevail on the merits, the social cost of denying a motion to dismiss or granting leave to amend is at least in part internalized. But where no fee shifting provisions are available, courts should be partic-

ularly cautious about granting leave to amend a plainly inadequate complaint.

**24.** The signature page on the memorandum in opposition to the underwriters' motion to dismiss lists ten law firms as counsel of record.

ficient particularity to show both how the corporate defendants had "adopted" the analysts' reports and why the corporate defendants had no reasonable basis to believe that the projections made could come true.

Even if the VeriFone defendants had adopted and helped distribute the analysts' reports, the complaint here, unlike the amended complaint in *Alfus II*, presents no facts which indicate that the Verifone defendants ever knew that the projections in the Morgan Stanley and Dean Witter reports lacked a reasonable basis. Nor do plaintiffs plead facts which show that the company defendants knew that the analysts' reports lacked a reasonable basis and withheld that information from investors.

 In 10b–5 cases, where knowledge of certain matters pertaining to fraud is peculiarly within the defendant's knowledge, the particularity requirement of Fed. R.Civ.P. 9(b) is relaxed. *Wool*, 818 F.2d at 1439. Nonetheless, this special rule does not read Rule 9(b) out of existence. Mere conclusory allegations of fraud are insufficient. Statements of the time, place and nature of the fraudulent activities are required, so that defendant can prepare an adequate answer to the allegations. *Wool*. 818 F.2d at 1439.

Here, plaintiffs do particularly describe the time and place that the projections were made. Plaintiffs do not, however, describe the nature of the fraud, other than to make the conclusory assertion that the projections issued by the analysts lacked a reasonable basis. This type of unsubstantiated conclusion is insufficient to satisfy Rule 9(b).

Plaintiffs' claim amounts to a legal theory that it is *per se* unreasonable for a corporation to disclose only one of two projected futures. The complaint merely describes that the VeriFone defendants were aware of two potential futures, and then asserts that the one disclosed lacked a reasonable basis. Plaintiffs assume that the projections made in the analysts' reports are outside of the reasonable range at the time they were made because (1) other, more negative projections were

available to the defendants and (2) the future fell below the projections disclosed. However, the law requires more than an assumption. Plaintiffs must show why the projection disclosed lacked a reasonable basis. The fact that defendants had contradictory projections available to them cannot, by itself, support an inference that the disclosed projection was unreasonable at the time it was made. As the *Wielgos* court explained:

> Issuers need not reveal all projections. Any firm generates a range of estimates internally or through consultants. It may reveal the projection it thinks best while withholding others, so long as the one revealed has a "reasonable basis"—a question on which other estimates may reflect without automatically depriving the published one of foundation.

*Wielgos*, 892 F.2d at 516.

For this reason, defendants' motion to dismiss the claims against the VeriFone defendants arising out of the analysts' reports is GRANTED.

 The question now is whether to dismiss the claims based upon the Morgan Stanley and Dean Witter analysts' reports without prejudice. All of the reasons described in the preceding section militate in favor of a dismissal with prejudice. Plaintiffs' law firms have extensive experience in these actions and know full well their obligation to establish a factual basis for their claim that the VeriFone defendants distributed fraudulent projections. Moreover, these law firms had six months after the initial pleadings to fill these factual gaps before filing the amended consolidated complaint on March 22, 1991. Still, they failed to come forward with factual allegations establishing a disclosure obligation on the part of the VeriFone defendants. It would not be unreasonable to assume that if plaintiffs' lawyers of the skill and experience of those at bar did not make such allegations, there is no basis for them.

Yet the court is inclined to afford plaintiffs' counsel one more opportunity to allege a set of facts supporting a theory that the Verifone defendants had no reasonable

basis for adopting and distributing the Morgan Stanley report in April and the Dean Witter reports in May and July. The court is aware that if these allegations ultimately prove unfounded, this litigation will have served no useful purpose. Out of an abundance of caution, however, plaintiffs will be given 30 days from the date of this order to file a third complaint, but one directed solely to these issues. In preparing such amended complaint, counsel should note that Rule 9(b) does not require rococo factual detail, but does require straightforward pleading of facts which, if true, constitute the elements of fraud.

### B. *State Law Claims.*

■■■ The state law claims for fraud, negligent misrepresentation, and violation of California Corporations Code Section 1507 must also be dismissed for failure adequately to state a claim.

The California Court of Appeal recently reviewed the state common law and securities laws and concluded: "California law does not permit the application of the fraud-on-the-market theory of reliance to causes of action based on fraud and deceit, negligent misrepresentation, or violation of section 1507." *Mirkin v. Wasserman,* 227 Cal.App.3d 1537, 234 Cal.App.3d 719, 278 Cal.Rptr. 729, 746 (1991). The California Supreme Court has granted a petition for review in *Mirkin.* 282 Cal.Rptr. 840, 811 P.2d 1024 (1991). If *Mirkin* is affirmed by the California Supreme Court, the claims here fail because plaintiff has failed to plead actual reliance.

Even if the California Supreme Court reverses the decision in *Mirkin* and adopts the fraud-on-the-market theory, plaintiffs have not stated a claim based on alleged misrepresentations in the prospectus. The above analysis discussing the federal fraud-on-the-market requirements would be equally applicable, and plaintiffs' claim fails for the purposes discussed in part III.A.1.

Plaintiffs have failed to state a claim for relief under California state law. Accordingly, the defendants' motion to dismiss the state law claims is GRANTED WITH PREJUDICE.

### C. *Insider Trading Claims.*

The Insider Trading and Securities Fraud Enforcement Act, Section 20A of the Exchange Act of 1934, as amended, 15 U.S.C. § 78t–1 ("ITSFEA"), provides that:

Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable * * * to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased * * * or sold * * * securities of the same class.

15 U.S.C. § 78t–1(a).

■■■ A careful parsing of the somewhat tangled initial sentence of § 20A discloses that an insider—one who trades while in the possession of material, nonpublic information—is liable only where an independent violation of another provision of the securities laws has occurred. The few reported decisions which have already interpreted § 20A have reached this conclusion. *See T. Rowe Price New Horizons Fund, Inc. v. Preletz,* 749 F.Supp. 705, 709 (D.Md. 1990); *H.A.B Associates v. Hines,* Fed.Sec. L.Rep. ¶ 95,665, 1990 WL 170514 (S.D.N.Y. 1990).

Section 20A also requires that the trading activity of plaintiffs and defendants occur "contemporaneously." 15 U.S.C. § 78t–1(a). The meaning of the term "contemporaneous" is not defined by statute. Instead, the drafters sought to adopt the definition of the term "which has developed through the case law." H.R.Rep. No. 910, 100th Cong., 2d Sess. 27 (1988) *reprinted in* 1988 U.S.C.C.A.N. 6043, 6064. The House Report cited *Wilson v. Comtech Telecommunications Corp.,* 648 F.2d 88 (2d Cir.1981); *Shapiro v. Merrill, Lynch, Pierce Fenner & Smith, Inc.,* 495 F.2d 228 (2d Cir.1974) and *O'Connor & Associates v. Dean Witter Reynolds, Inc.,* 559 F.Supp. 800 (S.D.N.Y.1983) as examples of three cases which have "developed" the definition of "contemporaneous." H.R.Rep. No.

910 at 27 n. 22. All three cases discuss the "contemporaneous" trading in the context of an implied 10b–5 action against an insider.

In *Shapiro* and *O'Connor*, the plaintiffs' and defendants' trades occurred less than a week apart, and the courts found that plaintiffs had stated causes of action for insider trading under 10b–5. *Shapiro*, 495 F.2d at 241; *O'Connor*, 559 F.Supp. at 803. The *O'Connor* court further held that plaintiffs who trade prior to the time that the defendant does are not harmed. *Id.* In *Wilson*, the court recognized that a rule which allowed all parties who purchased or sold securities during the full period from when the insider traded to when the insider disclosed would not serve the purpose of the insider trading cause of action because noncontemporaneous traders do not require protection. Thus, the *Wilson* court held that parties who trade a month after defendants do not trade "contemporaneously." *Wilson*, 648 F.2d at 94–95.

By reference to these cases, the drafters of ITSFEA meant to protect and compensate investors who trade at the same time as the insider or for some short period thereafter, and that a reasonable period of liability could be as short as a few days, but no longer than a month. In *Alfus I*, the court considered these cases and others in the context of a 10b–5 cause of action and, without determining one way or another whether an implied 10b–5 cause of action for insider trading exists in the Ninth Circuit, held that "the contemporaneous requirement is not met if plaintiff's trade occurred more than a few days apart from defendants' transactions." *Alfus I*, 745 F.Supp. at 1522 (citing *Wilson*, 648 F.2d at 94–95).

██ Defendants' two alleged insider trades occurred (1) at the time of the March 13, 1990 IPO, when VeriFone and many of the individual defendants sold shares of VeriFone stock, and (2) on August 20, 1990, when defendant Caufield allegedly sold almost 500,000 shares of VeriFone stock. Compl., ¶ 69. The representative plaintiffs are alleged to have purchased their stock on April 4, 1990, July 24, 1990, August 3,

1990 and August 6, 1990. Plaintiffs do not state a claim under § 20A on the basis of these trades.

██ The IPO sales by the individual defendants fail to state a § 20A claim because, as discussed above, no violation of the securities laws occurred in connection with the IPO. As plaintiffs' complaint merely asserts that the defendants failed to disclose projections in connection with the IPO, neither the issuer or the individual defendants were under an obligation to disclose any "material, nonpublic information" other than that which was disclosed in the prospectus. *See* part III.A.1, *supra.*

██ Plaintiffs' insider trading claims against Caufield fail because no plaintiff traded "contemporaneously" with Caufield's sale on August 20. All of the named plaintiffs had completed their trading activity before the date in which defendant Caufield allegedly sold his shares. Insiders are under a duty to refrain from trading until the material, nonpublic information in their possession is disclosed. No liability can attach for trades made by plaintiffs before the insider engages in trading activity. *O'Connor*, 559 F.Supp. at 803; *T. Rowe Price New Horizons Fund, Inc.*, 749 F.Supp. at 710; *Alfus I*, 745 F.Supp. at 1523.

Thus, even if the plaintiffs are able to state a claim under 10b–5 for the allegedly misleading analysts' reports, and even if plaintiffs can show that Caufield was in possession of material, nonpublic information which would have made the statements in the analysts' reports not misleading, the representative plaintiffs nonetheless cannot state a § 20A claim against Caufield because each of the plaintiffs' trades occurred prior to Caufield's.

██ Plaintiffs argue that even if the representative plaintiffs cannot assert an individual claim against the defendants under § 20A, they may nonetheless maintain a class action for the benefit of those who did trade contemporaneously with defendants. Not so. Where a plaintiff lacks standing to bring a claim personally, that plaintiff cannot represent the class. *Si-*

*mon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 40, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976); *La Mar v. H & B Novelty and Loan Co.,* 489 F.2d 461, 465–66 (9th Cir.1973); *In re Seagate Technology II Securities Litigation,* Fed.Sec.L.Rep. ¶ 95,427, 1990 WL 134963 (N.D.Cal.1990).

The class action "representative" requirement embodied in Rule 23(a) is often considered to be a question of standing. Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 1761. Some commentators, however, have observed that Rule 23(a) will also bar certain class actions where all of the requisites for Article III standing are established.[25] In these cases, Rule 23(a) serves to deter litigation by making it difficult for counsel to locate representative plaintiffs. In some situations, this judicial deterrence of private law suits creates under-enforcement of the law. In the case at bar, however, the deterrent effect of the "representative" requirement serves the Congressional enforcement scheme for insider trading litigation.

██ Plaintiffs' contrary argument that § 20A will be rendered "meaningless" if plaintiffs who do not have § 20A claims are prohibited from asserting class actions on behalf of investors who have valid § 20A claims is absurd. Those investors who did trade contemporaneously with defendants have an incentive to bring suit, and all the incentive that Congress wished to create rests with those contemporaneous traders. By limiting actions under § 20A to investors who traded contemporaneously with insiders, and by limiting recoverable damages to the amount by which the defendant benefited, Congress deliberately created a narrow private cause of action. The drafters of § 20A could have created as broad a private enforcement scheme as the courts have created under Rule 10b–5, but chose not to do so. Significantly, the final version of ITSFEA deleted provisions for an express cause of action for non-contemporaneous trading which had been present in earlier versions of the legislation. H.R.Rep. 910 at 27. Plaintiffs cannot persuade this court that § 20A is "useless" if it does not apply as broadly as 10b–5 might.

Defendants' motion to dismiss plaintiffs' claims under § 20A is GRANTED WITH PREJUDICE.

## IV. THE UNDERWRITER DEFENDANTS' MOTION TO DISMISS.

The underwriter defendants have moved to dismiss the complaint on many of the same grounds as the VeriFone defendants.

### A. *Statements in the VeriFone Documents.*

For the reasons discussed in parts III. A.1. and III.B., *supra,* the underwriter defendants' motion to dismiss all federal and state law claims against the underwriters arising out statements in VeriFone's prospectus, VeriFone's Forms 10–Q, and VeriFone's press releases is GRANTED WITH PREJUDICE.

### B. *Statements in the Analysts' Reports.*

As discussed above, part III.A.2. *supra,* the research reports of the underwriter defendants did make actual projections, and liability attaches under Rule 10b–5 for projections that lacked a reasonable basis at the time they were published. *Marx,* 507 F.2d at 489; *Alfus II,* 764 F.Supp. at 603.

However, the complaint against the underwriter defendants fails for the same reasons as does the complaint against the VeriFone defendants.[26] Plaintiffs' conclusory assertion, repeated in ¶¶ 44, 49(c), 53 and 56(b) of the complaint, that the defendants lacked a "reasonable basis" for the projections disclosed, does not satisfy the pleading requirements of Rule 9(b).

**25.** Macey & Miller, 58 U.Chi.L.Rev. at 80 (discussing *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)).

**26.** Plaintiffs complain about two reports issued by Dean Witter and one report issued by Morgan Stanley. Defendant Robertson is not accused of issuing a misleading report, and is not defending against these claims.

As discussed above, plaintiffs can satisfy the scienter requirement for a 10b–5 cause of action in the context of an allegedly misleading projection only if they can assert facts which show that the underwriter defendants had no reasonable basis for the projections made in the analysts' reports at the time that those reports were published. It is insufficient to allege merely that the forecasts did not come true, *Marx*, 507 F.2d at 490; it is insufficient to allege merely that other, less positive forecasts were known to the underwriter defendants; and it is insufficient merely to allege that the VeriFone defendants were aware of internal information so that the VeriFone defendants would have had no reasonable basis for publishing the reports. The scienter of the underwriter defendants must be established to state a claim against them. *Ernst & Ernst*, 425 U.S. at 206, 96 S.Ct. at 1387 ("There is no indication that Congress intended anyone to be liable for such practices unless he acted other than in good faith.").

The underwriter defendants' motion to dismiss the claims against them arising out of the projections in the analysts' reports is GRANTED. Plaintiffs will be given 30 days from the date this order is filed to amend their complaint.

## V. *CONCLUSION.*

For the reasons discussed, IT IS HEREBY ORDERED THAT:

A. The VeriFone defendants' and the underwriter defendants' motions to dismiss plaintiffs' federal and state law claims arising out of statements in the March 13, 1990 prospectus, VeriFone's Forms 10–Q, and Veri-Fone's press releases is GRANTED WITH PREJUDICE.

B. The VeriFone defendants' and the underwriter defendants' motions to dismiss plaintiffs' 10b–5 claims relating to the reports of stock analysts is GRANTED. Plaintiffs are given 30 days from the date of this order to amend their allegations regarding the April Morgan Stanley report and the May and July Dean Witter reports in accordance with this order.

C. The VeriFone defendants' motion to dismiss plaintiffs' § 20A claims for insider trading is GRANTED WITH PREJUDICE.

D. As no claims can be asserted against Robertson, Stephens & Co., the clerk shall enter judgment in favor of that defendant.

## VI. ORDER FOLLOWING HEARING ON PLAINTIFFS' MOTION TO VACATE.

Following the court's order granting defendants' motion to dismiss, plaintiffs moved to vacate same. The court heard argument on February 14, 1992, and has considered the briefs filed by counsel. For the reasons stated by the court at the February 14 hearing, plaintiffs' motion to vacate is DENIED.

The court's order, affording plaintiffs 30 days to file an amended complaint with respect to the analysts' reports only, was originally filed on December 21, 1991. At the February 14 hearing on plaintiffs' motion to vacate that order, the court observed that the 30 day period had expired and inquired whether plaintiffs would seek to file an amended complaint following the denial of plaintiffs' motion to vacate. Counsel for plaintiffs informed the court that plaintiffs had no additional facts to allege and that no amended pleading was anticipated.

Accordingly, this matter is hereby DISMISSED WITH PREJUDICE in its entirety. The clerk is directed to enter judgment in favor of all remaining defendants.

SO ORDERED.