**George GENNA, On Behalf of Himself and All Others Similarly Situated, Plaintiff,**

v.

**DIGITAL LINK CORPORATION, Vinita Gupta, Daniel L. Palmer, Timothy K. Montgomery, Stanley E. Kazmierczak, Toni Bellin, Benjamin W. Berry, Morey R. Schapira, Gregory M. Avis and Charles R. Moore, Defendants.**

**No. C–96–20867 RMW.**

United States District Court, N.D. California.

Sept. 11, 1997.

John E. Grasberger, John K. Grant, Milberg Weiss Bershad Hynes & Lerach LLP, San Francisco, CA, William S. Lerach, Milberg Weiss Bershad Hynes & Lerach LLP, San Diego, CA, Richard S. Schiffrin, Schiffrin & Craig, Ltd., Bala Cynwyd, PA, for plaintiff.

Steven M. Schatz, Timothy T. Scott, Frederick N. Saal, Wilson, Sonsini, Goodrich & Rosati, Palo Alto,CA, James E. Lyons, Garrett J. Waltzer, Margot M. Kramer, Skadden, Arps, Salte, Meagher & Flom LLP, San Francisco, CA, for defendants.

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND AND GRANTING DEFENDANTS' MOTION TO STRIKE

WHYTE, District Judge.

The motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) of defendants Digital Link Corporation ("Digital Link" or "Company"), Vinita Gupta, Daniel L. Palmer, Timothy K. Montgomery, Stanley E. Kazmierczak, Toni Bellin, Benjamin W. Berry, Morey R. Schapira, Gregory M. Avis and Charles R. Moore was heard on

April 18, 1997.[1] The court has read the moving and responding papers and heard the argument of counsel. For the reasons set forth below, the court grants defendants' motion to dismiss with thirty (30) days leave to amend.

## I. BACKGROUND

Plaintiff brings this securities class action lawsuit against Digital Link and certain of its officers and directors[2] on behalf of himself and all persons who purchased Digital Link common stock between September 12, 1994 and December 29, 1995, excluding defendants, members of their immediate families, and any entity in which a defendant has a controlling interest.

Digital Link designs, develops, manufactures, markets and sells high speed data communications equipment for wide area networks. This action focuses on the development of one such product, the Wide Area/Asynchronous Transfer Mode ("ATM") GateWay product ("GateWay product"). The GateWay product was designed to translate and switch voice and video data and was to be sold to original equipment manufacturers ("OEMs") for resale to domestic and foreign telephone companies.

In his Corrected Complaint filed on October 24, 1996 ("Complaint"), plaintiff alleges that defendants violated federal securities laws, specifically § 10(b) and § 20(a) of the Securities Act of 1934 ("1934 Act") and Securities and Exchange Commission ("SEC") Rule 10b-5.[3] The Complaint alleges that defendants made false and misleading statements about the development of the Gate-Way product, the strong international and domestic demand for and market acceptance of Digital Link's products, and Digital Link's prospects for earnings growth. Plaintiff claims that the fraudulent scheme and course of business artificially inflated the price of Digital Link stock from $7-3/4 to a class period high of $34, which allowed Digital Link insiders to sell and dispose of their shares of stock at inflated prices before problems with the product were revealed and the price collapsed to about $8 per share.

### A. Plaintiff's Allegations

The Complaint alleges that after the 180 day lock-up period following Digital Link's January 31, 1994 initial public offering, Digital Link's insiders intended to begin selling off their shares. Because the price of Digital Link stock had fallen to below $10 per share, plaintiff claims that defendants misrepresented the state of development of the GateWay product and the future revenue and earnings growth to be derived from the product to reverse the decline in stock price. Thus, on September 12, 1994, defendants announced the introduction of the GateWay product. Defendants allegedly assured investors that this product would allow Digital Link to capitalize on the ATM market's "explosive growth" and that it would soon become Digital Link's "largest product" and "a significant part of the total Wide Area ATM strategy offered by Digital Link." Complaint ¶ 6. Defendants also represented that "production quantities" of the GateWay product would be available in the first quarter of 1995. *Id.* ¶ 7.

As Digital Link's stock responded to these positive statements, Digital Link's controlling venture capitalists, including Summit Partners, distributed 500,000 shares to their limited partners, and Digital Link insiders began selling their own shares. This resulted in the sale or other disposition of 971,234

---

1. Defendants also filed an accompanying motion to strike the declaration of John B. Torkelsen filed in support of plaintiff's opposition to the motion to dismiss. The motion is granted on the grounds that the declaration is a document outside the pleadings which is not properly considered on a motion to dismiss.

2. The individual defendants hold the following positions: Gupta, chairperson of the board and chief executive officer; Palmer, president and chief operating officer until October 17, 1995; Montgomery, vice president of sales; Kazmierc-zak, vice president of finance, chief financial officer and secretary; Bellin, vice president of operations; Berry, vice president of marketing; Schapira, vice president of marketing; Avis, director and general partner of Summit Partners, which managed and exercised control over partnerships which sold stock; and Moore, director.

3. Although the corrected complaint alleges a violation of § 20(a), no such violation is mentioned in plaintiff's description of his claims in the Joint Case Management Statement.

shares between September 20, 1994 and December 22, 1994 at as high as $25 per share. Plaintiff claims that while Digital Link insiders were unloading these shares, they knew that the Company was experiencing serious problems in completing the final design and commercial production of the GateWay product. Plaintiff also asserts that defendants knew that no firm, including AT & T Network Systems, was willing to purchase the product and that Digital Link could not expect to receive significant revenue from the product until some time in 1996.

The Complaint further alleges that despite defendants' knowledge of these problems, they made additional misrepresentations regarding the GateWay product's progress and Digital Link's earnings per share. Digital Link's stock reached a high of $33–3/4 by late March 1995 and traded at high prices during February through May, 1995, allowing insiders to sell another 185,000 of their shares at prices as high as $30–1/2.

Plaintiff also claims that when defendants disclosed that the GateWay product sales were going slower than anticipated, they indicated that this was due to marketing decisions by its OEM customers and not to any problems with the development or performance of the product. In August, 1995, when Digital Link's stock was still selling at as high as $28–3/4 per share, insiders sold another 57,000 shares.

On October 17, 1995, Digital Link reported increased sales and earnings for its third quarter ended September 30, 1995 and disclosed that Palmer, its president and chief operating officer, had resigned, when he was allegedly actually fired. Plaintiff asserts that in an interview with Dow Jones, Kazmierczak admitted that Digital Link would delay the release of its GateWay product since "the gateway needs to be redesigned because it doesn't function effectively" and that the release of the product would be delayed until at least mid–1996. *Id.* ¶ 10. He also allegedly stated that there was a "modest slowing" of Digital Link's business in the United Kingdom. *Id.* The stock price per share dropped to $16 on October 18, 1995.

Plaintiff claims that the stock price decline was halted by defendants' subsequent false reassurances about the strength of Digital Link's business in the United States, the modest nature of the slowdown in its international business, and that it still expected to earn $0.18 per share in the fourth quarter of 1995 and $ .64 per share for the 1995 full year. The Complaint alleges that Digital Link's stock continued to trade at artificially inflated levels throughout the balance of the class period.

Plaintiff asserts that defendants' reassurances between October 17, 1995 and December 29, 1995 were false and misleading as defendants knew that the problems with Digital Link's international operations were serious, that its competitive position there was being seriously eroded, and that its domestic business was soft. During this period, the Digital Link insiders sold another 149,940 shares of their Digital Link stock at prices as high as $19–1/2 per share.

On December 29, 1995, Digital Link revealed that its fourth quarter results would be very poor, that it would suffer declines in revenues and net income due to weak domestic sales and worsening international sales, and that these adverse conditions would continue for at least the next two quarters. As a result, the stock price dropped to $8 per share.

## B. Digital Link's Rebuttal

Digital Link claims that although it announced in September, 1994 that it expected shipments of GateWay to commence in the first quarter of 1995, the announcement was accompanied by an express warning that many milestones had yet to be achieved. When the first quarter of 1995 arrived, Digital announced that it was still developing the product. Then, in the midst of the class period, Digital announced that it had experienced the very delays that plaintiff alleges were concealed. In its Form 10–Q for the quarter ended June 30, 1995, Digital announced that:

> The Company has experienced delays in the development of their product. Given its complexity, there can be no assurance that this product will not encounter further technical or other difficulties which could

significantly delay its deployment or acceptance.

Digital continued working on GateWay throughout the summer. In October, 1995, it announced its third quarter results and announced the redesign of the software aspects of its GateWay product. It also announced at this time that its international sales were slowing and that this slowdown would "continue for the next several quarters." Finally, on December 29, 1995, Digital pre-announced its anticipated fourth quarter results, which reflected the slowdown previously predicted.

## C. Basis of Digital Link's Motion

Defendants now move this court to dismiss plaintiff's Complaint with prejudice for failure to plead fraud with particularity and failure to state a claim upon which relief can be granted. First, defendants claim that the Complaint blurs together the statements of defendants with the statements of third party analysts. Second, they contend that the individual defendants who made no public statements should be dismissed. Third, with respect to the remaining defendants, they assert that no claims survive since Digital Link disclosed the very facts allegedly omitted and because their statements "bespoke caution." Fourth, defendants claim that plaintiff fails to meet his burden of pleading specific facts that give rise to a strong inference of scienter. Finally, they argue that plaintiff's claim is barred by the statute of limitations.

## II. LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 12(b)(6)

The issue to be decided on a motion to dismiss is whether the moving party has shown beyond a doubt that the opposing party can prove no set of facts in support of its claim entitling it to relief. *Conley v. Gibson*, 355 U.S. 41, 45–47, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). A complaint may be dismissed as a matter of law for two reasons: (1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal theory. *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 533–34 (9th Cir.1984) (citing 2A J. Moore, Moore's Federal Prac-

tice ¶ 12.08 at 2271 (2d ed.1982)). In determining a motion to dismiss, all allegations of the complaint should be construed in the opposing party's favor. *Sun Savings & Loan Assoc. v. Dierdorff*, 825 F.2d 187, 191 (9th Cir.1987). Moreover, to dismiss, it must appear to a certainty that the plaintiff would not be entitled to relief under any set of facts that could be proved. *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987). Motions to dismiss are therefore generally viewed with disfavor under this liberal standard. *Intake Water Co. v. Yellowstone River Compact Comm.*, 590 F.Supp. 293, 296 (D.C.Mont.1983), *aff'd*, 769 F.2d 568 (9th Cir. 1985), *cert. denied*, 476 U.S. 1163, 106 S.Ct. 2288, 90 L.Ed.2d 729 (1986).

In cases alleging securities laws violations, motions to dismiss are subject to stricter standards because whether a statement or omission is misleading to potential investors "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significances of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *Fecht v. Price Co.*, 70 F.3d 1078, 1080 (9th Cir.1995) (citation omitted). Thus, "only if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of law." *Id.* at 1081 (internal quotations omitted).

### B. Federal Rule of Civil Procedure 9(b)

Rule 9(b) applies to actions brought under the federal securities laws. *In re GlenFed., Inc. Sec. Litig.*, 42 F.3d 1541, 1544 (9th Cir.1994). Rule 9(b) provides that "in all averments of fraud and mistake, the circumstances constituting the fraud or mistake shall be pleaded with particularity." Mere conclusory allegations of fraud are insufficient. *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir.1989). The allegations must be specific enough "to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done

anything wrong." *Semegen v. Weidner,* 780 F.2d 727, 731 (9th Cir.1985). A complaint meets this standard if it alleges the time, place and content of the alleged fraudulent representation or omission; the identity of the person engaged in the fraud; and "the circumstances indicating falseness" of "the manner in which [the] representations [or omissions] were false and misleading." *GlenFed,* 42 F.3d at 1547–48. Thus, a plaintiff must provide an explanation as to how an alleged statement or omission was false or misleading when made. *Id.* at 1548.

## C. Liability under Section 10(b) and Rule 10b–5

■ Section 10(b) of the 1934 Act makes it unlawful for any person:

> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange[,] ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5, enacted thereunder, makes it unlawful "[t]o make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). To successfully allege a violation of Rule 10b–5, a plaintiff must show (1) a false and misleading statement or omission of material fact; (2) scienter; (3) reliance; and (4) resulting damages. *Paracor Fin., Inc. v. General Elec. Capital Corp.,* 96 F.3d 1151, 1157 (9th Cir.1996).

## D. False or Misleading Statements and Omissions

■ To state a claim for securities fraud, a plaintiff must plead with particularity the circumstances of the fraud, including the statements made and an explanation as to why or how such statements are false or misleading. Fed. R. Civ. Proc. 9(b); *GlenFed,* 42 F.3d at 1548. Simply because statements are different or conflict does not mean fraud exists. The Ninth Circuit explains:

The fact that an allegedly fraudulent statement and a later statement are *different* does not necessarily amount to an explanation as to why the earlier statement was false.... In order to allege circumstances constituting fraud, plaintiff must set forth facts explaining why the difference between the earlier and the later statements is not merely the difference between two permissible judgments, but rather the result of a falsehood.

*GlenFed,* 42 F.3d at 1549. To allege falsity, a plaintiff should point to contemporaneous, inconsistent statements by defendants or show that information available to defendants showed different results than defendants predicted. *See id.*

## E. Private Litigation Securities Reform Act

■ The parties dispute whether The Private Litigation Securities Reform Act of 1995 ("Reform Act") enacted on December 22, 1995 applies here. The Reform Act states:

> The amendments made by this title shall not affect or apply to any private action arising under title I of the Securities Exchange Act of 1934 or title I of the Securities Act of 1933, commenced before and pending on the date of enactment of this Act.

15 U.S.C. § 77l note. The clear implication from the statutory language is that the Reform Act does apply to pre-Act events, so long as the case was filed after December 22, 1995. That is the conclusion reached in two well-reasoned Northern District of California decisions and is also the conclusion of this court. *See In re Silicon Graphics, Inc.,* 970 F.Supp. 746 (N.D.Cal.1997); *Hockey v. Medhekar,* No. C–96–0815 MHP, 1997 WL 203704 (N.D.Cal.1997).

The Reform Act requires that the complaint in a securities fraud action to specify each statement alleged to have been misleading and the reason or reasons why the statement was misleading. 15 U.S.C. § 78u–4(b)(1)(B). It also requires that the complaint state with particularity the facts which give rise to a "strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Finally,

with respect to forward-looking statements made, the defendant cannot be held liable if the forward-looking statement was "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or if plaintiff fails to prove that the statement was made with "actual knowledge" that it was false or misleading. 15 U.S.C. § 78u–5(c)(1).

## III. ANALYSIS

Plaintiff claims that defendants are liable for fraud for three types of allegedly misleading statements: (1) analyst reports; (2) company press releases and reports; and (3) "boilerplate" warnings and disclosures.[4]

### A. Liability Based Upon Analysts' Reports

#### 1. Entanglement with Analysts

■ A plaintiff seeking to impose liability based on projections contained in analyst reports must show that defendants have put their "imprimatur, express or implied, on the projections." *In re Stac Electronics Sec. Litig.*, 89 F.3d 1399, 1410 (9th Cir.1996) (citing *In re Verifone Sec. Litig.*, 784 F.Supp. 1471, 1486 (N.D.Cal.1992), *aff'd*, 11 F.3d 865 (9th Cir.1993)). For example, a defendant is sufficiently entangled when he has reviewed the analysts' forecasts, and by his activity, made an implied representation that the information is true or at least in accordance with the company's views. *Caere*, 837 F.Supp. at 1059. Merely providing analysts with historical information and correcting factual inaccuracies is not sufficient. *Id.* However, the law is clear that "third party analysts' reports, prepared with information provided by defendants, may be a basis for 10b–5 liability." *Cooper v. Pickett*, 137 F.3d 616 (9th Cir.1997) (citing *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959).

■ Since the allegation of entanglement is central to the overall allegation of securi-

ties fraud, it must be plead with the degree of specificity required under Rule 9(b). *Caere*, 837 F.Supp. at 1059. The pleading should (1) identify the specific forecasts and name the insider who adopted them; (2) point to specific interactions between the insider and the analyst which allegedly gave rise to the entanglement; and (3) state the dates on which the acts which allegedly gave rise to the entanglement occurred. *Id.* (citing *GlenFed*, 11 F.3d at 848; *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1439 (9th Cir.1987); *Verifone*, 784 F.Supp. at 1487).

Plaintiff challenges several allegedly misleading analyst reports regarding Digital Link's earnings forecast, alleging that defendants should be liable for them. Complaint ¶¶ 46, 49, 50–53, 57–58, 60, 62–63, 67. Plaintiff contends that defendants adopted the analysts' false reports because Digital Link executives, including Gupta and Kazmierczak, provided and approved the information in the reports before they were issued. *See id.* ¶¶ 49, 50–53, 62–63.

■ Defendants submit that these allegation should be dismissed because they do not sufficiently "entangle" defendants with the statements. The court finds the allegations lack ideal specificity but do sufficiently show "entanglement" to withstand defendants' motion. Plaintiff alleges the date of each report, the substance of the report and that, for example, the analyst

> met with, interviewed and/or obtained the key information for this report from Digital Link executives, including Gupta and Kazmierczak. Digital Link approved the information in this report before it was issued, knowing that the report would be released and become part of the total mix of information affecting the price of Digital Link stock.

*Id.* at ¶ 46.[5]

#### 2. Knowledge of Falsity and Scienter

■ Plaintiff, however, has failed to sufficiently allege that defendants knew that

4. Although the Complaint alleges that the boilerplate warnings were false and misleading, plaintiff's opposition brief does not specifically argue this. Instead, it addresses the warnings in the context of the "bespeaks caution" defense.

Nonetheless, because of the allegations in the complaint, the court shall assume the plaintiff is proceeding as to these statements.

5. In paragraphs 49, 57, 60 and 67 plaintiff alleges that Gupta and Kazmierczak met with particu-

the analysts' forecasts were unreasonable when they were issued. An analyst's forecast is unreasonable only if there was no reasonable basis for it at the time at which it was made. *Caere*, 837 F.Supp. at 1060 (citing *Wielgos v. Commonwealth Edison*, 892 F.2d 509, 516 (7th Cir.1989); *Verifone*, 784 F.Supp. at 1487). It is not enough that the forecast merely turned out to be wrong. *Id.* Further, because unreasonableness of the reports is central to the allegation of scienter, the facts supporting the allegation must "provide a strong inference of fraudulent intent." *Id.* (citing *GlenFed*, 11 F.3d at 848). Plaintiff's allegations do not do so.

Thus, plaintiff has not adequately stated a cause of action for liability based on the analysts' reports.

## B. Company Statements

■ Plaintiff alleges that on various occasions during the class period, Digital made misleading statements about the GateWay products. Specifically, plaintiff challenges the following statements:

* On September 12, 1994, Digital Link issued a press release introducing its GateWay product:

> Digital Link ... today introduced the Wide Area ATM (W/ATM) GateWay....
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> The W/ATM GateWay will be in evaluation during the fourth quarter of 1994 with production quantities available in first quarter 1995.
>
> &ast; &ast; &ast; &ast; &ast; &ast;

"The W/ATM GateWay is a significant part of the total Wide Area ATM strategy offered by Digital Link," according to Benjamin "Tac" Berry, Digital Link vice president of business development. "From the industry's first cell-based Data Service Interface, to the W/ATM PremisWay, an ATM access multiplexer for the customer premises, Digital Link continues to provide solutions for data communications today and in the future," Berry continued.

* On September 14, 1994, Gupta gave an interview, which was reported in a September 14, 1994 Dow Jones News Service report, and stated that Digital Link would experience "explosive growth" and that its W/ATM GateWay product would be distributed in "production quantities" by the first quarter of 1995 and sold by AT & T under its private label.

* On October 17, 1994, Digital Link reported its third quarter 1994 results, quoting Gupta as stating:

> Another highlight of the quarter was Digital Link's announcement of an OEM agreement with AT & T Network Systems to market our W/ATM GateWay product link.

Plaintiff asserts these statements were false when made because the "true facts then known to defendants, based upon their access to internal corporate data," were (1) that Digital Link was encountering "serious and persistent difficulties in completing the final development [of the GateWay product] for commercial production, such that commercial production of this product would be delayed substantially;" (2) that the software program used in the product "was defective and deficient and did not work;" (3) that "Digital Link was unable to correct these difficulties, which meant that the software would have to be completely re-designed and re-done, resulting in a lengthy delay in the completion of the W/ATM GateWay;" (4) that "[d]ue to serious problems in completing the final development of the ATM GateWay product, defendants knew the product would be significantly delayed from reaching commercial products;" (5) that "[b]ecause of Digital Link's forecast of strong 1995 and 1996 earnings depended on significant revenue contribution from its new W/ATM GateWay product, defendants knew those earnings forecasts were false;" (6) that "Digital Link's position in the international market, especially in the UK and Europe, was not nearly as strong as was represented;" (7) that "development of th[e] product was severely troubled and ... could not be completed for

---

lar analysts on identified dates and provided certain information which was then reported to the market. Although plaintiff fails to identify the

reports that relayed the information to the market, the pleading sufficiently identifies the circumstances for notice purposes.

commercial production and would not contribute materially to Digital Link's revenues for a substantial period of time;" and (8) that "[a]s a result of the foregoing problems with Digital Link's business, defendants' forecasts of earning per share of $.60 for the 1995 full year and $0.89 for 1996 were false when made and were not believed by the defendants." Complaint ¶ 48.

These allegations are too broad and conclusory to satisfy the pleading requirements of Rule 9(b) and the Reform Act. The Complaint's statements of fraud based on "access to internal corporate data" without specific contemporaneous facts are insufficient to support a claim. Although projections and other forward looking statements can, under some circumstances, be the basis for a securities fraud action, the Complaint fails to identify any specific statements or facts which demonstrate that any of the defendants knew of these "true facts." Nor does the complaint state with any particularity when defendants first discovered these alleged facts. Moreover, defendants' statements about the GateWay product are not necessarily made false by the "true facts." Further, the Complaint fails to identify what report was made on October 17, 1994, and in any event, it is difficult to see how its contents could be considered false and misleading. Finally, the Complaint does not plead facts that show a strong inference of fraud.[6] Thus, the court finds that plaintiff's fraud claim based on these statements fails.

■ Additionally, plaintiff asserts that the following reports issued by Digital Link were false and misleading:

\* On March 31, 1995, Digital issued its 94 Annual Report and 94 10–K which stated:

Substantial progress was made on the development of the W/ATM GateWay during 1994 .... The product was shipped for evaluation to AT & T Network Systems during the last quarter of 1994, and the

Company is continuing to develop the product.

\* On April 18, 1995, Digital reported its 1Q 95 results in a press release:

[W]e made significant progress on new product development .... We introduced the W/ATM GateWay and other new products for the base business to strengthen out market position.

\* In April, 1995, Digital Link issued its 1Q 95 report:

[T]he Company made revenue shipments of the W/ATM GateWay during the quarter. The Company believes that this is a very significant step toward the success of this product .... [O]ur new products ... will strengthen our position .... Internationally, we are in a strong position to grow.... The W/ATM GateWay is an exciting addition to our product line, and we are very excited about its market potential.

Plaintiff asserts that these positive statements were also false and misleading since there were other "true facts, then known only to defendants based upon internal Digital Link corporate data." Complaint ¶ 65. These "true facts" consist of substantially the same allegations in paragraph 48 of the Complaint set forth above. The Complaint adds, however, an allegation that Digital Link was encountering such serious problems that the product could not be in commercial production prior to the second half of 1996. The Complaint further alleges that while defendants' indications that the reason Digital Link was not selling more of its product was a slowness in the market, the true reason for the unwillingness of OEM customers to order significant quantities of the products was the defective product. Complaint ¶ 65(g). Plaintiff does not provide any specifics as to the problems being experienced, beyond that there were "serious and persistent difficulties in completing the final development" and

---

6. An open question under the Reform Act is whether its pleading requirements for scienter are those adopted by the Second Circuit prior to the adoption of the Reform Act or whether the Act intends an even more stringent standard. The question need not be answered in this order because plaintiff's current complaint fails to meet the pre-Reform Act Second Circuit rule that

a strong inference of fraud is adequately pleaded if the complaint pleads with particularity specific facts that either (1) constitute evidence of either reckless or conscious behavior, or (2) establish a motive and an opportunity to commit fraud. *See In re Time Warner, Inc. Sec. Litig.,* 9 F.3d 259, 269 (2d. Cir.1993).

that the software program was "defective and deficient and did not work." The Complaint also does not state when defendants first knew about the alleged problems or the slowness in the market. Thus, the allegations with respect to these statements are also insufficient to meet Rule 9(b)'s standards.

■ Plaintiff also contends that the following reports issued by Digital Link were false and misleading:

* On June 7, 1995, Digital Link issued a press release announcing the execution of an OEM agreement with Siemens AG, which would "further strengthen[ ] Digital Link's international presence."

* On July 19, 1995, Digital Link reported its second quarter 1995 results in a press release:

"The results this quarter are a strong indication of the progress we have made in the domestic market. I believe Digital Link's broader product link offering and competitive positioning has resulted in wider and deeper market penetration," said Vinita Gupta, Chief Executive Officer.

* In late July, 1995, Digital issued its 2Q 95 report:

To date, the W/ATM GateWay has been shipped for revenues to both out OEM partners .... We continue to believe that the W/ATM GateWay is a very well-positioned product with many competitive disadvantages ... [W]e remain optimistic about the Company's business this year based on momentum in domestic business and our continued dominant market share in international SMDS/ATM access products.

* During September and early October, 1995, rumors circulated that Digital Link might be encountering difficulties marketing its W/ATM GateWay product, which Digital Link denied.

Plaintiff asserts these statements were false when made because the "defendants concealed and/or failed to disclose ... material, adverse non-public information, disclosure of which was necessary to make the statements made not misleading, and which

information was known to defendants." Complaint ¶ 72. This allegedly undisclosed information is substantially similar to that alleged in paragraph 65 of the Complaint. It adds, however, allegations that because defendants knew that Digital Link's forecast of strong fourth quarter 1995 earnings and 1996 earnings depended on significant revenue contribution from its new GateWay product, defendants knew those earnings forecasts were false. As with the other allegedly misleading statements, the allegations regarding these statements, particularly the denial of the rumors, are insufficient under Rule 9(b) and the Reform Act.

■ Lastly, plaintiff claims that Digital Link's stock price dropped after Kazmierczak admitted in a Dow Jones interview that Digital Link would delay the release of its W/ATM GateWay product, as "the gateway needs to be redesigned because it doesn't function effectively" and that "the release of this product would be delayed until at least mid–1996." He allegedly also stated that there was a "modest slowing" of Digital Link business in the UK. The Complaint alleges that statements made by defendants between October 17, 1995 and December 29, 1995, when Digital Link disclosed the adverse information, were false and misleading since defendants knew that there were serious problems with Digital Link's international operations, that its competitive position was being seriously eroded, that its domestic business was also soft, and that there was no possibility that Digital Link could achieve the projected earnings per share. Complaint ¶ 75.

The only statements alleged with any particularity are:

* On October 17, 1995, "Digital Link reported increased sales and earnings for its third quarter ended September 30, 1995, and quoted Gupta as saying:

'Third quarter results continue to show the strength of our internet working products in the domestic market,' said Vinita Gupta, chief executive officer. 'Market penetration has been increased as a result of our marketing strategy of broader product link offerings and competitive positions.' "

\* Shortly thereafter, Digital Link issued its 3Q Report to Shareholders, which contained a letter signed by Gupta, which stated:

> We are pleased with the third quarter 1995 and year-to-date results.
>
> \* \* \* \* \* \*
>
> We believe Digital Link has gained market share domestically in the internet working business segment, while we have successfully preserved our position as the dominant supplier of SMDS/ATM access products in Europe.
>
> \* \* \* \* \* \*
>
> The Company believes that the decline in the SMDS/ATM access business during the third quarter was attributable in part to the slowdown of SMDS in Europe, and in particular, the United Kingdom. While at Telecom 95 recently in Geneva, we were able to gain a bit more insight into the reasons for this slowdown through our OEM partners, Siemens and Alcatel. Market confusion among Frame Relay, SMDS and ATM technologies and delays in the further development of the SMDS network due to technical problems were both sighted [sic] as reasons for the slowdown in sales. Digital Link continues to remain a significant SMDS access product provider for the European network. We anticipate the lag in SMDS/ATM business will continue for the next several quarters.
>
> \* \* \* \* \* \*
>
> All in all our largest business segment, internet working, has shown strong growth in revenues. Although we have seen a slowdown in SMDS business, we are optimistic about the opportunities in 1996. In the meantime, we are positioning and striving to offer a broader product link in WAN access products and are ready to move the Company forward.

The court finds that plaintiff has not adequately pled that these statements were false and misleading when made. Plaintiff also does not identify with any particularity how defendants knew the information relayed in the statements was false at the time the statements were made.

The Reform Act and, to some extent, pre-Reform Act case law attempt to balance the rights of investors harmed by fraud with the rights of corporations and their principals to be free from expensive securities litigation that is based upon significant declines in stock values resulting from non-fraudulent conduct. Particularity in pleading is required to preclude plaintiffs from bringing lawsuits based solely upon hindsight, i.e. claims that in essence say that since the stock price dropped unexpectedly, the company and its principals must have known of the problems earlier and deliberately not informed the market about them. In this case, the requirements have not been met so the applicable law requires that the court insist on more particularity. The type of allegations made by plaintiff (the GateWay project was "encountering serious and persistent difficulties," the software "did not work," and the product had "design and software problems") are so general that the court cannot be sure that plaintiff in not basing his claim on hindsight.

The court concludes that plaintiff has not met his burden as to any of the defendants' statements. The Complaint fails to allege with specificity any contemporaneous statements or facts that were inconsistent with defendants' allegedly misleading statements. Plaintiff's broad and conclusory allegations do not show with any specificity that defendants' statements were false and misleading at the time they were made. Defendants' motion to dismiss claims based on these statements is granted.

## C. False and Misleading Warnings and Disclaimers

 The Complaint also alleges that Digital Link released misleading warnings and disclaimers on its Forms 10–Q and 10–K and in its annual report. These warnings allegedly were "boilerplate" and themselves were false and misleading because they did not apprise investors of known adverse facts.

Digital Link's reports state that it anticipated shipping trial units of the GateWay product in 1995, but that the product is "a complex development with many critical milestones yet to be achieved." *See* Com-

plaint ¶ 78. The reports also state that there can be no assurance that a market for the W/ATM product would continue to develop or that the Company's product would meet the needs of this market. The reports caution that any significant delays in the development, introduction or shipment of products could have a material adverse effect on the Company's business and operating results.

According to plaintiff, these warnings greatly understated the serious and persistent difficulties with the GateWay product. If there were known, existing difficulties at the time the warnings were made, plaintiff can justifiably claim that the warnings were insufficient. However, the facts pleaded do not show with particularity what specific difficulties existed at the time the warnings were issued. The Reform Act and the "bespeaks caution" doctrine are intended to protect defendants who make forward-looking statements which are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u–5(c)(1). Here, Digital Link warned in September 1994 that the GateWay product "is a complex development with many critical milestones yet to be achieved" and that "[t]here can be no assurance that a market for the W/ATM product will continue to develop...." Form 10–Q for September 1994. In March and April 1995 Digital Link advised that the Company was continuing to develop the product. In its 10–Q for the quarter ending June 30, 1995 it specifically stated that it had experienced delays in development and that further difficulties could be encountered which could significantly delay deployment or acceptance. In October 1995 Digital announced that a software problem would required redesign. These warnings based upon the current allegations of the Complaint would appear to have appropriately advised the market of potential risks. Plaintiff needs to plead what particular difficulty actually existed at the time of one or more of these warnings which made the warning misleading to the market.

## D. Liability of Defendants Who Are Not Alleged To Have Made Any Statement

Defendants claim that only defendants who actually made statements can be held liable because the Reform Act abolishes group pleading and because the holding in *Central Bank of Denver v. First Interstate Bank*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) eliminated "aiding and abetting" liability for § 10(b) claims. The court is not persuaded that a "scheme to defraud" could not be alleged which would be outside the scope of the "aiding and abetting" activity discussed in *Central Bank*. Further, there is a potential for liability if the allegedly false or misleading statements are shown to be the collective actions of the defendant officers. However, because plaintiff has not met his burden of pleading false and misleading statements, the court does not determine at this time whether any individual defendant should be dismissed with prejudice.

## E. Statute of Limitations

A plaintiff must file a claim for relief within in one year from discovery of the facts constituting the violation of § 10 and Rule 10b–5 or within three years after such violation. *Stac*, 89 F.3d at 1411. Defendants claim that plaintiff first received notice of the fraud when Digital Link filed its Form 10–Q on August 15, 1995. Plaintiff claims that he and the public first received notice of the fraud on October 17, 1995 when the stock price plunged on October 17, 1995. Because it is not clear whether plaintiff was aware or suspected fraud prior to October 17, 1995, plaintiff's claims survive defendants' motion to dismiss on statute of limitations grounds. *See id.* (new defendants' claims dismissed where plaintiffs were clearly aware of or suspected fraud at the time complaint was filed).

## III. ORDER

For the foregoing reasons, the court grants defendants' motion to dismiss with thirty (30) days leave to amend. The court does not believe that the particularity pleading requirements mean that the Complaint must have evidentiary detail or that the complaint needs to be lengthy. What the court

expects is an amended complaint that is concise and tailored to the specific facts of this case. If plaintiff can do so in good faith, he should plead facts which show that he has information supporting defendants' making of *false* or *misleading* statements *with scienter* and not just generalizations that suggest that he is just assuming that since Digital Link experienced development difficulties and did not perform as anticipated, defendants must have known of difficulties at the time they made their statements to the market. In other words, plaintiff must allege the particular misconduct of defendants.